IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 19-00010-05-CR-W-BP |
| | ) | |
| NAYELI FUENTES-VERDUGO, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

On January 8, 2019, defendant Nayeli Fuentes-Verdugo, along with co-defendants Omar Eliseo Barraza-Bueno, Alfredo Soto-Contreras, Rey Moreno-Chepe, and Daniel Calderon-Varga, was charged in a twenty-five count Indictment. (Doc. # 27). Defendant Nayeli Fuentes-Verdugo is charged in the Indictment with three criminal counts: (1) Conspiracy to Distribute Methamphetamine; (2) Aiding and Abetting Possession with Intent to Distribute Methamphetamine; and (3) Aiding and Abetting Distribution of Methamphetamine. Defendant has pled not guilty to the charges.

The matter currently before the Court is defendant Nayeli Fuentes-Verdugo's Motion to Dismiss Due To Outrageous Government Conduct, With Suggestions. (Doc. #56). Defendant contends that the government engaged in outrageous conduct and violated her due process rights when it created a drug sting operation that resulted in her being targeted and criminally charged. (Doc. # 56). In opposition, the government maintains that during the sting operation, which involved the sale of twenty-five pounds of methamphetamine from defendants to the government's undercover agent, the government took no actions that even approached the threshold for finding outrageous government conduct. (Doc. # 69).

For the reasons set forth below, the Court finds that a hearing on the motion is not necessary and it is recommended that defendant Nayeli Fuentes-Verdugo's motion to dismiss be denied.

## I. FACTUAL BASIS FOR DEFENDANT'S MOTION

Defendant's motion to dismiss is based upon the following factual allegations:

1. Relying upon discovery provided by the government, it is alleged that, sometime before June of 2018, Federal law enforcement authorities set up an elaborate sting operation based in a warehouse somewhere in the Kansas City area. Where this warehouse is located is a secret being protected to this date. Federal agents and informers posed as illegal drug and gun distribution kingpins and sought to make fake deals for purchase of large quantities of drugs and guns from any and all comers. Substantial efforts were made to record each such sting transaction. When possible, transactions were conducted at the warehouse. There, sophisticated recording systems, consisting of multiple cameras directed at different angles, and sensitive microphones, were stationed to memorialize activities outside, at the entrance to the warehouse, and inside the building, both in a large open area, and also in an office. When activities occurred away from the warehouse site, multiple recording devices were employed, including body cams and mics on the undercover agents, and remote cameras and mics employed by supporting surveillance teams.

2. Beginning in June of 2018, a series of fifteen sting interactions occurred involving, primarily, Alfredo Soto-Contreras (Named Defendant #1), and Omar Eliseo Barraza-Bueno (Named Defendant #2). These interactions consisted of the undercover agent paying money to these men for guns and drugs they delivered to him, and also the undercover agent planning with these defendants for the defendants to sell to the agent a large amount of methamphetamine, originally projected to be upwards of 100 pounds, but ultimately scaled back to 25 pounds.

3. Nayeli Fuentes-Verdugo is the wife of defendant Barraza-Bueno. Ms. Verdugo is a Mexican national who has legally lived and worked in the Bakersfield, California area for many years. During a lull in her work schedule, Ms. Fuentes-Verdugo traveled to the Kansas City area to visit her husband, defendant Barraza-Bueno, who was staying here. Though Ms. Fuentes-Verdugo has lived in the United States for a considerable period of time, she only speaks and understands her native Spanish language.

4. Shortly after Ms. Fuentes-Verdugo arrived in the Kansas City area, three interactions occurred between the undercover agent and defendant Barraza-Bueno, on December 10, 2018 at her husband's home in Kansas City, Kansas, on December

2

17, 2018 at Elvira's Restaurant on Independence Avenue in Kansas City, Missouri, and on December 18, 2018 at the undercover sting warehouse. On each occasion, Ms. Fuentes-Verdugo was present, at the home in Kansas City, Kansas because she was staying there, and at Elvira's and the warehouse because she was brought there either by Barraza-Bueno or by Daniel Calderon-Vargas, another codefendant. On each of the three occasions, English language discussions about guns and drugs were engaged between the undercover agent and defendant Barraza-Bueno. On December 17, at the instance of the undercover agent, it was discussed that, instead of monies for drugs being paid directly to Barraza-Bueno, as had been the practice in all previous transactions, the monies for the anticipated December 18 transaction would supposedly be paid to Ms. Fuentes-Verdugo. This conversation was never directed to Ms. Fuentes-Verdugo, and was never translated from English to Spanish.

5. During all three interactions, any reasonable person would have taken note that Ms. Fuentes-Verdugo could not understand the English language conversations going on around her.

6. On December 18, a passenger car, driven by a codefendant, arrived at the undercover warehouse. Approximately 25 pounds of methamphetamine was contained in the trunk of that car. Shortly thereafter, defendant Barraza-Bueno arrived in a separate vehicle. The undercover agent inquired why others, including Ms. Fuentes-Verdugo, were not present, and was informed that the others were elsewhere eating breakfast. The undercover officer refused to carry on with the transaction, and insisted that the others be present before he would continue. A call was made, directing that the others, including Ms. Fuentes-Verdugo, present themselves at the warehouse. About fifteen minutes later, a pickup truck arrived at the warehouse, driven by defendant Daniel Calderon-Vargas, with Ms. Fuentes-Verdugo as a passenger. Defendant Calderon-Vargas got out of the truck and went inside the warehouse, but Ms. Fuentes-Verdugo remained in the truck. At that point, the undercover agent ordered that defendant Calderon-Vargas have Ms. Fuentes-Verdugo come into the warehouse. Per that direction, defendant Calderon-Vargas waved to Ms. Fuentes-Verdugo to come into the warehouse, and she complied with that direction which was initiated by the undercover officer. The drugs, which had arrived much earlier, were then taken out of the car, and weighed. A couple of minutes after that, the undercover officer got out of harm's way, and heavily armed officers, who had secreted themselves in another part of the warehouse, stormed in, and placed all of the codefendants under arrest.

(Doc. # 56 at 1-5).

The government's opposition to the motion to dismiss contained the following factual statements:

1. On December 17, 2018, an undercover agent with ATF (UC), and four of the members of the indicted drug conspiracy (including Defendant Fuentes-Verdugo) sat in a restaurant and made arrangements for the sale of 25 pounds of methamphetamine (the defendants selling to the UC) to take place the next day. After the sale, the defendants were to travel in caravan with the UC to Chicago so the UC could sell to another party (this was a rouse). In confirming the logistics of the transaction with Defendant Barraza-Bueno, it was established that everyone would be arriving at an agreed-upon location for the sale, but that only three would be continuing to Chicago. During that discussion, the UC and Barraza-Bueno engaged in the following exchange:

> UC: She's staying here? (referring to Defendant Fuentes-Verdugo)
> B-B: She's gonna stay here.
> UC: So, she's coming down, she's taking the money?
> B-B: Mm-hm. (nodding)
> UC: Alright.

2. The next day, on December 18, 2018, the date of the transaction, the UC initially met with Barraza-Bueno and Defendant Moreno-Chepe at the agreed-upon location, a warehouse. The purpose of the meeting was for the sale of the aforementioned 25 pounds of methamphetamine, and then to continue on in a caravan to Chicago as planned. While discussing the next steps in the plan, the UC asked Barraza-Bueno to get everyone down to the location as originally discussed the day prior. Barraza-Bueno then sent a text presumably directing that two others, Defendants Calderon-Vargas and Fuentes-Verdugo, come to the location. Five minutes later, apparently being a very short distance away, they arrived. Once they pulled up to the location, Calderon-Vargas entered the building while Fuentes-Verdugo remained in the passenger seat of the vehicle in which she arrived. The UC was not yet aware of Fuentes-Verdugo being inside the vehicle. Then, the UC, Barraza-Bueno, and Calderon-Vargas engaged in the following exchange:

> UC: Where's she at? (referring to Defendant Fuentes-Verdugo)
> B-B: Right there.
> C-V: She's in the truck.
> UC: Tell her to come in.

3. Calderon-Vargas then goes over and beckons Fuentes-Verdugo to come inside. After Fuentes-Verdugo enters the location, the UC closes the open door. The defendants then calmly and casually gather around a table in the warehouse, and

weigh out the twenty-five pounds of methamphetamine (brought by Barraza-Bueno). After the amount of methamphetamine is confirmed, the UC uses a rouse to separate himself from the four defendants. Once the UC is at a safe distance away, several members of law enforcement enter the warehouse and take the defendants into custody.

(Doc. # 69 at 2-3).

A review of the facts set forth by the parties, demonstrates that the government and defendant agree that Ms. Fuentes-Verdugo was present during a meeting on December 17, 2018, at a restaurant where four members of the alleged drug conspiracy discussed with the undercover the arrangements for the sale to the undercover of 25 pounds of methamphetamine. Defense counsel acknowledges that part of the discussion involved an agreement that the money for the sale of the drugs would be paid to defendant, Fuentes-Verdugo. It was also agreed at the meeting that everyone would be present at the sale, but that only three would continue on to Chicago to assist the undercover in making a sale there. The next day, the undercover and two of the defendants arrived at the warehouse location. The undercover asked that everyone whom they had agreed would be there the day before come to the location. Shortly thereafter defendants Calderon-Vargas and Fuentes-Verdugo arrived together in a truck. When Fuentes-Verdugo was observed sitting in the truck, the undercover asked to have her come in and defendant Calderon-Vargas motioned her in and she responded inside the warehouse. It appears that at no time did the agent have any discussions directly with the defendant.[1] Defendant maintains that she does not speak or understand English and that much of the discussion concerning the drug transaction took place in English.

---

[1] Defendant's motion makes reference to an earlier interaction with the undercover at the home of Barraza-Bueno, the husband of Ms. Fuentes-Verdugo, for which she was present. However, the nature of that interaction or what discussions Ms. Fuentes-Verdugo was present for are not explained.

5

II.  LEGAL ANALYSIS

A.  Applicable Legal Standard

The doctrine of outrageous government conduct stems from a statement in United States v. Russell, 411 U.S. 423 (1973), a case involving the entrapment defense.  The Supreme Court found that the defendant in Russell was predisposed to commit the crime at issue, and therefore was not entrapped.  However, the Court noted that it might "some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction."  Id. at 431–32.[2]

Thus, the Eighth Circuit has recognized that "our cases have left open the possibility that, in rare instances, the investigative methods employed by law enforcement are so 'outrageous that due process bars the government from invoking the judicial process to obtain a conviction.'"  Combs, 827 F.3d at 794 (quoting United States v. King, 351 F.3d 859, 867 (8th Cir. 2003)).  The defense of outrageous government conduct is reserved for conduct that falls within the narrow band of the most intolerable government conduct, namely, actions violating the fundamental fairness, shocking the universal sense of justice, mandated by the Due Process Clause.  Id. at 794-95; United States v. Bugh, 701 F.3d 888, 894 (8th Cir. 2012).  "[T]he level of outrageousness needed to prove a due process violation is quite high, and the government's conduct must shock the conscience of the court."  United States v. Nieman, 520 F.3d 834, 838 (8th Cir. 2008) (citing Russell, 411 U.S. at 431-32).  As of the date of its decision in Combs in 2016, the Eighth Circuit

---

[2] Outrageous government conduct is an affirmative defense sometimes raised with the defense of entrapment, but the two are distinct.  "Whereas the defense of entrapment focuses on the predisposition of the defendant to commit the crime, the defense of outrageous government conduct focuses on the government's actions."  United States v. Combs, 827 F.3d 790, 794 (8th Cir. 2016) (quoting United States v. Hunt, 171 F.3d 1192, 1195 (8th Cir. 2016)).

6

noted that only two court of appeals decisions, both from the 1970's, had found government conduct so egregious as to violate a defendant's due process rights. 827 F.3d at 795.[3]

Outrageous government conduct includes some "creative activity" on the part of the government to manufacture a crime where it did not otherwise exist, solely for the purpose of obtaining a conviction. See, e.g., Greene, 454 F.2d at 787[4]; accord Twigg, 588 F.2d at 373. In order to prove government overreaching which constitutes a due process violation, the government's involvement must "amount to the engineering and direction of the criminal enterprise from start to finish." United States v. Smith, 924 F.2d 889, 897 (9th Cir. 1991).

B. Defendant's Allegations Do Not Meet the Legal Standard

In the instant case, Defendant asserts that the government's actions were outrageous because they targeted her for prosecution and manufactured the crimes for which she is being charged. Defendant argues that her only role in the sale of the twenty-five pounds of methamphetamine to the government's undercover agent was that role which the government had insisted upon. Defendant argues that these facts show that her involvement in the drug sale was "only because the government agents made it so." (Doc. # 56 at 7). Defendant also claims that the facts show the government "orchestrated" her involvement in the drug sale in that the government suggested to her husband that she receive monies for the proposed transaction, insisted that she be brought to the warehouse when the drug deal was consummated and directed that she be caused to come inside the warehouse. (Doc. # 56 at 7).

---

[3] The two cases are United States v. Twigg, 588 F.2d 373 (3d Cir. 1978), and Greene v. United States, 454 F.2d 783 (9th Cir. 1971).
[4] Greene has been impliedly overruled by the Ninth Circuit in United States v. Haas, No. 96-10530, 1998 WL 88550, at *1 (9th Cir. March 3, 1998), with the Court stating: "Greene predates Russell and Hampton [Hampton v. United States, 425 U.S. 484 (1976)], so does not reflect the current law of the circuit on outrageous government conduct."

7

The government has responded arguing that the government's actions, as alleged by defendant, involve only an undercover agent who was seeking clarification from one defendant about an upcoming narcotic sale, as far as who was to receive the monies, and then the next day requesting that all defendants be present as had been planned for the narcotics exchange. (Doc. # 69 at 6). The government argues that defendant has no authority for her position that the undercover agent's simple requests and clarifying questions to other defendants amounts to outrageous government conduct perpetrated against her. (Doc. # 69 at 6). The government further maintains that the undercover agent's actions don't meet the "conscious shocking" standard that must be met for the dismissal of the charges against defendant based on outrageous government conduct.[5]

Upon review, this Court finds that the government's conduct in this case as alleged by defendant Nayeli Fuentes-Verdugo did not meet the standard for outrageous conduct which must be met to constitute a due process violation. The evidence which she relies upon to support her motion to dismiss fails to show the type of conduct that is so intolerable it shocks this Court's universal sense of justice. The undercover agent's behavior in coordinating with defendant's husband, a co-defendant in this case, in defendant's presence, about the details of the money transfer for the drug sale that was planned for the following day is not outrageous or conscious shocking government conduct. Neither is the fact that defendant's husband agreed during this

---

[5] The government's response also argues additional facts in opposition to defendant's motion. These facts involve the same core facts argued by Defendant in her motion but provide further context and clarification as to details. While relevant and supporting of the government's assertion that the government's actions in this case did not constitute outrageous government conduct, these additional facts are not necessary to the Court's ruling of defendant's motion to dismiss.

8

conversation for defendant to be the person to receive the money for the drug sale the following day.

Even if defendant did not understand some of the conversations, because the conversations were held in English, the Court does not believe the undercover agent's actions in coordinating with her husband could be described as outrageous or conscious shocking. The undercover agent's actions the following day, during the execution of the planned drug sale, in insisting to defendant's husband that he needed to "get everybody here now…I will not change it," referencing the plans they had made the day prior, including defendant's receipt of the money for the drug sale also is not conscious shocking behavior or a law enforcement tactic which crosses the line. None of the undercover agent's actions alleged by defendant support an argument of "intolerable government conduct," United States v. Musslyn, 865 F.2d 945, 947 (8th Cir. 1989), or conduct which is "so outrageous and shocking that it exceeded the bounds of fundamental fairness." United States v. Johnson, 767 F.2d 1259, 1275 (8th Cir. 1985).

Rather, the Court finds the government's actions in coordinating the drug sting operation to be within the realm of permissible law enforcement investigative methods. The Eighth Circuit has specifically recognized that government agents may go a long way in concert with the accused without being deemed to have acted so outrageously as to violate due process. Hunt, 171 F.3d at 1195 (citing United States v. Kummer, 15 F.3d 1455, 1460 (8th Cir. 1994)). "In order to infiltrate the underworld of drug production federal agents often must participate in the illegal enterprise." Hunt, 171 F.3d at 1195. "Infiltration of criminal enterprise is a 'recognized and permissible means of investigation' that often requires the government agent to employ subterfuge, to participate in the planning of a crime, and even provide resources for a crime." Combs, 827 F.3d at 795 (quoting United States v. Sanchez, 138 F. 3d 1410, 1413 (11th Cir. 1998)). "It is well accepted that artifice

9

and stratagem may be employed to catch those engaged in criminal enterprises." Combs, 827 F.3d at 795 (quoting Sorrells v. United States, 287 U.S. 435, 441(1932)).  A sting operation where agents sell drugs to or buy drugs from a targeted individual will not ordinarily rise to the level of a due process violation.  See, e.g., Kummer, 15 F.3d at 1459-60 (sting operation itself was not so unpalatable as to require a finding that defendant's due process rights were violated).  Here, the government's actions in coordinating the drug sting operation and defendant's alleged involvement in it are consistent with permissible, aggressive and persistent investigative actions by the government.  See Bugh, 701 F.3d at 894 (the government's conduct in pursuing the defendant in order to purchase firearm represented an aggressive and persistent investigation, not outrageous government conduct that shocks the conscience).

The investigative actions of the government in this case are consistent with those upheld in the Eighth Circuit case of Combs, 827 F.3d at 794.  In the Combs case, the court held that the government's robbery sting operation which targeted the defendant as part of a group planning the robbery of a drug dealer did not shock the court's universal sense of justice or violate the defendant's due process rights.  Just as in Combs, the sting operation here was coordinated by law enforcement in response to information the government had which showed defendants were involved in illegal activity.

Defendant's argument that the Court should follow the Third Circuit's reasoning in Twigg, 588 F.2d at 373, to conclude that the government's tactics in executing the sting operation were so outrageous to violate due process is not persuasive.  The Eighth Circuit has called into question the applicability of Twigg.  In United States v. Berg, 178 F.3d 976, 979 (8th Cir. 1999), the Eighth Circuit stated that "[t]he Third Circuit has declined to follow Twigg, and its position has been called into doubt."  Moreover, the facts of this case are different than those of Twigg.  As discussed

above, the actions of law enforcement in this case fall within the permissible bounds of law enforcement investigation. The Court concludes that Twigg is not controlling on the facts before this Court and that the government's actions in the sting operation did not transgress the bounds of constitutionally permissible investigative methods.

Defendant's argument that she was not part of a methamphetamine conspiracy is a fact issue for the jury who must assess her guilt or innocence at trial, but does not provide a basis for granting a motion to dismiss in the circumstances of this case.

C. A Hearing Is Not Required

Defendant's original motion did not request a hearing, but rather claimed that the dismissal of the Indictment was warranted based upon the facts set forth in the motion. (Doc. #56 at 7). The government's opposition claimed that no hearing was required in order for the Court to decide the motion. In replying to the government's opposition, defendant claimed for the first time that the Court was required to hold a hearing prior to ruling the motion for the reason that:

> the Eighth Circuit requires that the question of outrageous government conduct be taken up by the trial court by way of pretrial motion and hearing. United States v. Nguyen, 250 F.3d at 646. The government has not advanced, and undersigned counsel has not found, a single instance in which an evidentiary hearing on this sort of subject was denied.

(Doc. # 73 at 11).

The Eighth Circuit in United States v. Nguyen, 250 F.3d 643, 645 (8th Cir. 2001) held that claims of outrageous government conduct are questions of law to be resolved by the court and not a jury. Thus, in the Eighth Circuit if the issue of outrageous government conduct is not raised in a pretrial motion pursuant to Fed. R. Crim. P. 12(b)(2), it is considered waived. Id. at 646. Contrary to defendant's argument, the court in Nguyen did not discuss whether the court was

required to hold an evidentiary hearing before ruling on a motion to dismiss for outrageous government conduct.

However, other jurisdictions have addressed the issue of when a defendant is entitled to a hearing on a claim of outrageous government conduct. In United States v. Swiatek, 819 F.2d 721, 725 (7th Cir. 1987), defendant claimed that he had been "pre-targeted" and vindictively singled out for prosecution by the ATF Strike Force because of its failure to convict him in an earlier prosecution. In affirming defendant's conviction, the appellate court concluded that it was unnecessary for the district court to hold a hearing before rejecting the defendant's claim that the government's conduct during its investigation was so outrageous as to violate his Fifth Amendment right to due process. The appellate court held that:

> A trial court need only grant an evidentiary hearing on the issue of outrageous government conduct when the defendant has presented specific facts that are sufficient to raise a significant doubt about the propriety of the government's actions. See Owen v. Wainwright, 806 F.2d 1519, 1523 (11th Cir.1986); cf. United States v. Hamm, 786 F.2d 804, 807 (7th Cir.1986) (to justify a suppression hearing, defendant must present facts that are "definite, specific, detailed and nonconjectural.").

Swiatek, 819 F.2d at 725. See, e.g., United States v. Wong, No. CR-95-20075-RMW, 1996 WL 225008, at * 8 (N.D. Cal. Apr. 29, 1996). For the reasons discussed above, the facts defendant relies upon to support her motion are insufficient, as a matter of law, to raise significant doubt about the propriety of the government's actions. Therefore, a hearing on the issues raised by defendant's motion is unnecessary.

### III. CONCLUSION

The Court finds that based on the facts alleged by defendant, as to the participation and actions of the government's undercover agent, the government's actions did not rise to a level such that defendant's due process rights were violated. Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendant Nayeli Fuentes-Verdugo's Motion to Dismiss Due To Outrageous Government Conduct, With Suggestions. (Doc. #56).

Counsel are reminded they have fourteen days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same. A failure to file and serve timely objections shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

                                                            */s/ Sarah W. Hays*
                                                          SARAH W. HAYS
                                                          UNITED STATE MAGISTRATE JUDGE